Ladies and gentlemen, please rise. This court is now in session. Please be seated. Would the clerk call the next case, please? 3-2-2-0-4-0-5, consolidated with 3-2-2-0-4-11 for oral argument. The case is argued at the cross appeal. Timothy M. Schiller and Amy Schiller, appellants by Erin Stanton v. Home Services of Illinois, LLC DBA, Coney & Stray Realty. Appellant by Richard Cronin. Thank you. Mr. Stanton, good afternoon. Good afternoon, Justices. My name is Aaron Stanton. I'm pleased to court Mr. Perna, counsel. I represent Timothy and Amy Schiller, the appellants, cross appellees in this case. The Schillers, I'll call them the Schillers for purposes of this argument, filed suit against Home Services of Illinois, which I'll call Home Services. You will see them referred to in the briefs as Coney & Stray or Berkshire Hathaway sometimes, seeking commissions on 30 fully executed purchase contracts that they obtained while they were working for Home Services. The Schillers' position is that they were entitled to 90% of those commissions because they earned those commissions during the term of their agreement by obtaining fully executed purchase contracts. Home Services' position is that because those contracts didn't close while the Schillers were working, they closed afterwards, that the Schillers no longer had a right to the commissions that they earned while they worked there. There's no factual dispute at all that the Schillers did all the work while they were working for Home Services to obtain and did obtain those 30 fully executed purchase contracts during the term of their agreement. So we went to trial and the jury returned a verdict in favor of the Schillers and the breach of contract. The trial court entered judgment against the Schillers on the Wage Act. Counsel, I'm curious, why did this go to trial and before a jury at all if everyone was in agreement with regards to the facts? Well, it's a good question. Home Services filed a 619A9, I believe, motion to dismiss. And the trial court held there was a question of fact as to when the commissions were earned. And there was cross motions for summary judgment. I think it was the second motion for summary judgment by Home Services. We filed a motion for summary judgment of breach of contract. And the trial court held that there was a question of fact. So it's somewhat of a truncated opinion. However, it's an interpretation of contract. An interpretation of contract is reviewed de novo. It's not a question of fact. I don't disagree with that. I think what the court held was in its opinion, its written opinion, was that there was a question as to whether or not the commissions were earned. And that was a factual issue that should go to trial. Okay. Does that answer your question, Erin? It does, but I am confused by the trial court's holding. But go on. Yes. I mean, and then the trial court held there was a question of fact. But then with respect to the Wage Act, agreed with the Home Services position that the commissions weren't, after the Shillers left, the commissions, even though they earned them, even though they had done all the work, that somehow they lost the right to those commissions after they resigned because those commissions or those transactions didn't close until after the Shillers left. So that is wrong in several respects, one with respect to the contract, two with respect to the Wage Act. And the big issue here is whether the commissions were earned. And I know Home Services in their briefs take issue with that and say it's a distraction, say it's not relevant. But this is a claim under the Wage Act, and the Shillers are seeking relief under Section 9 and Section 5 of the Wage Act, which requires the Home Services to pay them their full final commission and not reduce it. The Wage Act expressly defines final compensation as earned commissions. So earned commissions are certainly relevant to this matter. And if the commissions were earned, then certain presumptions come into play, including the regulation of the Wage Act, which is 56 Illinois Admin Code, Section 300.510A, and that's a regulation that, of course, carries the force of law, and that regulation addresses this issue. And it says salespersons who obtain a right to a commission under their contract, the fact that they leave and the contract doesn't close, the transaction doesn't close, doesn't mean they're stripped of their right to their earned commission. And that was something that the judge didn't consider. The judge also didn't consider he actually construed the agreement against the Shillers, any sort of ambiguity. So the judge's ruling, if you look at his ruling, it is only a few sentences. He based his ruling that the Shillers lost their right to their earned commissions on one sentence in the second paragraph of the second addendum. So there's the agreement here incorporates a sales associate agreement. It incorporates what's called the first addendum to that agreement that was signed at that time. And then there's a second addendum. And the trial court focused solely on this one sentence in the second paragraph of the second addendum that says, during the term, the Shillers commission shall be 90%. And that doesn't tell, doesn't address when the commission is earned. The commission is earned under paragraph six of the sales associate agreement. And that agreement, if I can just quote that, Your Honors, has two pieces. There's two separate events here. It's, quote, when sales associates shall perform any service whereby a commission is earned. That's one piece. The second piece is, quote, when a commission has been collected, it shall be distributed as soon as practical. So there's two whens. So there's two events. So when a commission is earned is separate from when a commission is paid and collectible. And the judge didn't consider that when he construed just one sentence of the second addendum. And the undisputed evidence here, and when a commission is earned, that was subject to debate. And there was testimony from the Shillers that they earned their commission when they obtained fully executed purchase contracts under that section six. Isn't that the case under the case law as well? Yes, that would be Zink versus Maple. Zink versus Maple holds that if it's unclear that the commission is earned when the fully executed purchase contracts are paid. So, in our view, under the Wage Act, under the contract, and under the undisputed fact that the Shillers did all the work to obtain these fully executed contracts while they were there, and even did the work afterwards, any sort of ancillary work, that they earned these commissions. And because they earned these commissions, the court should have looked at the regulation of the Wage Act, which says just because the commission, just because the underlying transaction doesn't close while the salesperson is there, doesn't mean that they're stripped of their right to that commission. And I think that's an important concept if you look at salespeople who only work on commission. Oftentimes, unless they get a draw, they get paid when the company gets paid. So I think that's the purpose of that regulation. It protects them. But the trial court judge ignored that and read in language in the second addendum that the transaction had to close while they were there. That's not there. It turns the regulation on its head. It also construes, if you consider that ambiguous, because it does say during the term, the Shillers commission shall be 90%. It doesn't say closed. It doesn't say earned. But the judge did construe it against the Shillers. And it's undisputed, the facts are undisputed, that Molly Ryan, who was the general counsel for the home services, did draft that contract, the second addendum. And she had been an attorney for 40 years. She had drafted. She couldn't remember how many contracts she had drafted. She admitted when she testified that specific language is very important. She could have made it clear in that language. She could have put closed. She didn't. So it's ambiguous. So under the law, the common law, that should be construed against the Shillers, even more so under the cases we cited with respect to. Because these are earned commissions. In order to strip someone of earned commissions, it has to be very clear. And it's not clear here. What about the provision in the contract that says, notwithstanding any other provision, that if it's not expressly provided in the second addendum, that the policy and procedure manual apply? Sure, Judge. So I think the issue there is, again, the Shillers do not take the position that the policy manual doesn't apply to them. They've never taken that position. But the second addendum, paragraph 9, says terms not addressed in the second addendum are subject to the home services policy manual. So it's always been the Shillers' position that their commissions are addressed in the second addendum. They have the right to 90% commission split on the 30 fully-executed purchase contracts that they obtained during the term of their agreement. And I think that question, if I can just kind of talk, give a little context to how the Shillers came to home services. And this, I think, will shed some light on that question, Your Honor, is the Shillers came to home services in April of 2010. And they came as part of the purchase of Shiller Real Estate, which was a company their parents owned. And the Shillers, everyone else who came over from Shiller Real Estate, like all the other real estate brokers at home services, signed what's called the Sales Associate Agreement. And that Sales Associate Agreement does have the earned language we just talked about, but it doesn't have a set commission schedule. When the Shillers negotiated their coming over to home services, they negotiated a first addendum. And that first addendum had what's called a paragraph that's called the 80-20 Commission Schedule. And that 80-20 Commission Schedule provided the Shillers would get 80% of all the commissions of fully-executed contracts that they brought in. That was then amended as part of the second addendum. But everyone else who didn't have this addendum, the agents who just signed the Sales Associate Agreement, they had what's called a Commission Schedule, which was a document that home services put out that was essentially a chart of commissions and sales volume. And you might hit this sales volume one year and have an 80% split, and the next year you didn't have such a good year and it came down to 60. The Shillers, that didn't apply to the Shillers. That was the undisputed testimony. Their general contractor called them unique in that way because they had their commission schedule, commission split, locked in. It was locked in, their first amendment, first addendum, and then their second addendum. So the answer to your question, Ron, is the second addendum says terms not addressed in this second addendum are subject to the Home Service Policy Manual. It was addressed. Their commission split was addressed. Everyone else wasn't. So that policy manual provision would not apply to the Shillers. It also wouldn't apply to the Shillers because home services never gave them notice of this provision. The Shillers started in April of 2010. The undisputed testimony is sometime in 2013, home services put this what we'll call the 50% terminated agent fee in their policy manual. The undisputed testimony is no one ever told the Shillers or anyone else at home services, there's been a change in the policy manual. Molly Ryan, who's the general counsel, drafted that. She also met with the Shillers before they signed the second addendum, never mentioned that. The position of home services is that the Shillers should have reviewed the policy manual periodically to see if there were any changes. That just doesn't comport with the law, which, John, which you cited Hannah v. Marshall Field, where there has to be some sort of notice given in a manner to make the worker aware that there's a change in the policy manual. You just can't change a 59-page policy manual, put something in there and not tell anybody. So in addition to that reason, the other reason is that they never had notice of it. And there's a third reason that the policy manual doesn't apply to. This kind of brings me back to my English class in high school. The word terminated agent, we outlined this in the briefs, is a passive participle. And we cite a case with this. And a passive participle under standard grammar construction means that the noun, the subject, which is agent, is receiving the action from the verb. So it means the Shillers were terminated. So if you apply standard grammar, if you apply the rule that any sort of ambiguity should be construed against home services, because they drafted this, and that the Shillers commission split should be protected, then it doesn't apply here. And again, Molly Ryan, the general counsel of home services, testified. She drafted this language. She could have made it clear. And if you read the whole policy, there's actually two pieces of the policy. And the first piece of the policy says, Separated agents, whether voluntary or involuntary, have to pay $500 to get listing agreements released. And the second half of the same policy says terminate agents. So there's a distinction there. And to the extent there's any ambiguity, I think if you apply the rule that ambiguity should be construed against the drafter, which is undisputed here with home services, and it should be to standard grammatical rules, the Shillers were not terminated agents, because it was undisputed that they resigned. Certainly the Shillers could have terminated the contract, which they did, but by the pure definition of grammatical definition of extremely ambiguity against home services, they weren't a terminated agent under that policy. So those are the reasons that the policy manual provision would not apply to the Shillers. It's an earned commission. It's set forth in the second addendum. They were unique in the words of Home Services General Counsel. Other agents, it would apply to, but the Shillers had this floor, you call it a floor, where they had an 80%, 20% commission schedule in their first addendum, and then a 90%. So it didn't apply because it clearly says terms not addressed, and it was addressed in here. And again, you constrain the ambiguity against home services. If you take the fact that earned commissions, in order to rescind those or reduce those, the contract language has to be clear. Here, it's not clear at all in any manner, shape, or form. So those are the first two points. Do you have a question, Your Honor? No, I just noticed your time was up. Oh, sorry. Thank you very much. I don't know if you have any questions. No, you have five minutes of rebuttal on this issue. Yes. Thank you. Yes. I'm sorry, Mr. Perna? Yes, it is. Good afternoon. Please, the Court. Richard Perna on behalf of the Defendant Home Services of Illinois. And, Your Honor, I'm going to go through this pretty quickly, because I'm going to go through it again when I bring in my brief-in-chief. But there's a lot of confusion on these sales associate agreements that I think needs to be cleared up. First of all, if you read the original sales associate agreement, the only thing that it really says in there that's very important, there's actually two things. One is that the rights of the sales associate to any commission relating to any transaction that was closed before such termination, and the termination means the termination of the sales associate agreement, shall not be divested by the termination. That's key. Secondly, the sales associate agreement incorporates, by reference in paragraph 20, the policy manual. The first addendum, we don't even have to look at that. That was superseded by the second addendum. Let's take a look at the second addendum. What was left out of my colleague's conversation was the term is defined in the second addendum. This second addendum will remain in effect until the parties agree in writing to either revise it or until either party terminates the IC agreement. Counsel just admitted his client terminated the IC agreement. Next, the term, the payment during the term, that is until either party terminates the IC agreement, which they did, shows commission split shall be 90%. Do you hear anything about what happens after the term? No. Therefore, the policy manual kicks in as to what occurs after the agreement is terminated. The Schillers actually acknowledged in this writing when they signed it, each of them, that they acknowledged the policies and procedures were binding upon them. If they didn't look at it... Counsel, what about the argument that they had to be given notice of a change in the policy and procedure manual and they were not? Your Honor, they had full access to the policy and procedures manual constantly on the intranet. They testified to that. They didn't bother to look at it. They knew they were signing a document that made it... Counsel, the case law says that you're entitled to notification that there's been a change in the policy and procedure manual. Your Honor, they were told, and it's reflected in this document, and it was a new policy and procedure manual, that they agreed that they were going to be bound by it, which means they had the right to look at it. They had access to it. It wasn't as if we hid it from them. Where's that in the record? I'd have to look it up, Your Honor. I will tell you that they did testify that both of them knew it was there. They used other documents that were in the intranet as well as the policy manual. The policy manual covers many different aspects, including expense reimbursement and the like. If this were not the case, may I suggest, then they would get no commission. The agreement only required us to pay a 90% commission during the term. And the factor of earned is a red herring. We never said they didn't earn something. It's what they earned. It was 90% during the term, and because of the policy manual provision, it was 50% after the term. And that's what Judge Schwartz looked at and determined that that followed in the fact that this was truly incorporated into the contract. The policy manual has been incorporated into the contract, and there's been no dispute of that. It was incorporated way back in the sales associate agreement. But it didn't provide at the time that it was incorporated in the sales associate agreement the 50% on termination. Your Honor, that would be irrelevant because at the time they signed the addendum, where they specifically acknowledged that those policies were going to be binding upon them, that was in there at that point in time. It didn't change after the fact, if that's your question. It existed at the time that they executed this. And that's in the, sorry? Do the policy manual changes require consideration? This would be consideration, Your Honor. I mean, we increased their commission from 80% to 90%. I don't believe it does. I think each, and actually that was ruled upon by the underlying court. Every one of these provisions in the sales associate agreement, as well as the addendum, states that incorporated by reference to this agreement is the Canning and Stray GMAC policy manual, because that was the name of the company at the time. The core policies and procedures in the agent select plan as may be modified from time to time. Now, understand it resides on something called the intranet. The intranet is necessary for them to do their daily work. That's also in the record and is testified to. And the other issue is there are many things in the policy manual, expense reimbursement. It's not hidden. It's bolded. It says terminated brokers provision. Lastly, because I only have a few minutes here, I want to get to final compensation. There's no dispute at all that if a deal doesn't close, nobody gets paid. They don't get a commission, 90% or 25% or anything else, or 50% commission, if a deal doesn't close. This happens all the time with brokers that do a lot of work. They don't close a deal. They don't get paid the commission. They go to some other broker, et cetera, and so forth and so on. In regards to final compensation, when they left my client's agreement, when they terminated their independent contractor agreement with my client, there was no way to calculate exactly what amounts were due them. In fact, one of the contracts didn't even bother to have a true sale price in it. So nobody knew what they were going to get paid at the time, if they were going to get paid. So it was totally impossible for anybody to pay anybody any amount of money in regards to final compensation. It was all speculative. It may close. It may not close. One of the transactions closed approximately a year or more after it was actually signed. That's not the intent of the Wage Act. That is stretching what the definition of final compensation is. If it's not final compensation, the Wage Act doesn't apply. In fact, if you look in the record, originally plaintiffs were claiming 36 pending transactions for $171,000 in a commission difference. And when we finally got to trial, there were only 30 of those 36 that actually closed, and it was only $155,000 in some change in transactions that happened. Throughout the arguments that have been made, counsel uses the term earned. Earned is not used in the agreements. We're talking about what is the commission split. The listing agreement is executed between the brokerage and the seller. Our contract is what split are the shillers going to get and when. If it was before they left and terminated their agreement, it was 90%. If it was after they left and terminated their agreement, it was 50%. They also keep on claiming that they were unique. Unique shows up nowhere in any of the agreements. Counsel for Home Services said that they were unique. That's why they had the first addendum. That's why they had the second addendum. But that doesn't change the terms of the contract just because you're unique. Lastly, they keep on using the term minimum, that the 90% was a minimum. You can scour every document, and I'll go through them in more detail in my case You will not find the word minimum in any of the documents at all. That's all I have at this point. Okay. I think that I'm confused, but I think you do your argument now. Okay, let me correct that. Is that how we're doing it? He gets his five minutes now? Yes. Okay. Sorry, Mr. Perona, that was my mistake. No. So, Mr. Stanton, you get your five minutes, everybody. Right. I think. Did you have that down for 15 minutes instead of five? I thought it was 15, 15, and five, and five. Yes, it is. That's what it is. Oh. Yes. It was confusing. That's why I thought that was going a little bit long. Yeah, that's fine. I was providing his argument. Yes. No, you've got 15, 15, and 15 for you, 15 for him, and yeah. Yeah, we're short, though. 15, 15, five, and five. He gets 15 for his minimum. Yeah, I think it's Mr. Perona's turn to make his argument, and then Mr. Stanton will do it. And then he should get 15 minutes. Right, for this argument. Yes. Okay. So you didn't get your full 15. He didn't take his full 15. I thought it was only 15. He was doing rebuttal. I was doing a rebuttal of counsel's argument. Okay. That's the way I understand it. Yes. Okay. It's the local rules. Well, you all understand it, and I don't, apparently, because I thought that you were entitled to more time. Right. Right. So fine. Go ahead. Sure. Counsel, you want to rebut this cross-appeal argument, so shouldn't Mr. Perona go first? Well, yeah. Sure. I think that's the way I can start. Yes. Thank you. So this is 15. That is 15. Okay. And the last one should have been five. Okay. That's why it seemed like it was going over. Sorry. That's why I was just rebutting his argument, and I was rushing it a little bit. Normally. Okay. Just let me get this. Sure. I defer to you on this. Normally, you would get 15 minutes for your main argument. You, as appellee, would get 15 minutes to respond to his main argument. Then he gets five minutes of rebuttal. Then you get 15 minutes for your main argument. But that isn't what's on this paper. So I, apparently... No, it was 15-5. 15-5, as I understood it. Right. Okay. All right. Well, you had your five on his case. Correct. Okay. And I'll do my 15 on mine. Okay. Okay. Thank you. Okay, Your Honor, or Your Honors, you're going to... We're going to rehash a little bit of what's going on because the arguments are very similar. I want to start out by discussing the denial of the judgment, notwithstanding the verdict. Jan will be. And that's going to require an investigation of the contracts again. And I'll go through the contracts. There are several terms in the Sales Associate Agreement which are important. First, as I previously stated, the commissions that would be earned in Paragraph 6 of the Sales Associate Agreement would be divided between Kennegan Stray GMAC and Sales Associate as stated in the company policy manual. That's in the actual Sales Associate Agreement. The rights of the Sales Associate to any commission relating to any transaction that was closed before such termination shall not be divested by the termination. The closed keyword, that's Paragraph 18. Paragraph 20, incorporated by reference to the agreement, is the Kennegan Stray GMAC policy manual, core policies and procedures. And again, Sales Associate acknowledges that this is the entire agreement between the parts. So it's incorporating the policy manual into the agreement. Again, as I stated, the first addendum was superseded by the second addendum. The second addendum defines term. Term is the second addendum will remain in effect until the parties agree in writing to revise the second addendum or until either party terminated the IC agreement. Again, that's what Counsel's Client did. They terminated the IC agreement. The commission split. During the term, Shiller's commission split shall be 90%. And of importance is that the second addendum amended and modified all previous agreements consistent with the terms therein. If it didn't change the term, it didn't modify it. But all terms set forth and they were modified. And lastly, again, the Shillers acknowledged the policies and procedures manual and that they were bound by it in the signing of this agreement in the addendum. The policies and procedures manual states, it is also the policy of coding and straight to pay commission to terminated agents at a rate of 50% on all pending transactions closing after the agent's termination date. Counsel wishes to change that terminology away from what's stated in the second addendum, which talks about termination of the IC agreement. That's the termination we're talking about, not firing. There's nothing in here that says you have to be fired to be terminated. It was the termination of the agreement. Except, Counsel, the language of the policy and procedure manual doesn't say agents who terminate. It says terminated agents. That means something was done to the agent. The agent was terminated. Not that the agent terminated the agreement. Well, if you look at terminated and you look at them together, Your Honor, termination actually is talking about a termination of the relationship. They're terminated. They're no longer, their licenses are no longer held by, in this case, in the original case, Kennegan-Strayer Home Services of Illinois. So they've terminated their relationship. That's the terminated. Not that something was done to them. So in regards to JNOV, the court examined these documents. The court made a decision on count two that we did not breach the contract, that the plain language of the contract was not ambiguous, that it was a matter of law and taking the facts which were undisputed and applying to that contract. The court deemed that we didn't breach the contract. Unfortunately, when we filed our JNOV, he denied the JNOV, entered the judgment by the jury saying that we did breach the contract, but in the same breath entered an order saying we didn't breach the contract. And that's one of the reasons that we're here today, because I think he got it correct. There was no ambiguity in the contract. He heard the facts of the pardons. He looked at the contract. He applied the law to the contract, and he said this is what this means. Now, understand that under the License Act, an agent can only be paid by a sponsoring broker. After they terminated, we were no longer their sponsoring broker. There's one exception to that, and that is that they could get paid after they terminate the license with us based upon the agreements with their previous broker. The addendum says you only get 90% during the term. The term says when either party terminates the IC agreement. So when they terminated the IC agreement, their right to 90% ended. And this, again, is understanding that nothing is received by anyone, nothing is transferred to anyone unless there's a closing. And that was the whole issue with the wage act. Nobody gets paid a dime.  They would have demanded the full payment of the 90% commission. They didn't do that. In fact, they went over to App Properties, and App Properties paid them the difference between the 50% that we paid them, because they did receive it, and the 40% they would have received had they not terminated the contract. And they only paid them, and this is Thad Wong, who's the, I believe, CEO of App Properties. They only paid them when the closing occurred. And again, not all the closings and contracts, rather, that were in place at the day that they left eventually closed. So we didn't get a commission. They didn't get a commission. We're talking the difference between something that was earned and something that was agreed to be split. They're making a big deal of earned. Earned has nothing to do with it. The contract dealt with the day you signed the contract, you had a right to something. Contract said, if it closes before you terminate this contract with us, our independent contractor agreement or sales associate agreement, you get 90%. Silence. The second addendum says if it's not talked about here, you have to look at the policy manual. And the policy manual made the provision that allowed them to receive the 50%, because it's our argument today that if that provision wasn't there, the contract ended, we didn't receive anything. They didn't, quote, unquote, earn anything before the termination. If that were the case, the phrase in the second addendum that said, your split is 90% until you terminate the sales associate agreement would have no effect. That's not exactly what the phrase says, though, is it? No, it says, Your Honor, it says, the second addendum will remain in effect until the parties agree in writing to revise the second addendum or until either party terminated the IC agreement. During the term, shows commission split shall be 90%. The rights under the contract expired when they terminated their agreement. In order for me to pay them, they have to have a right to receive something, and that is in the policy manual, and that's why it's there. And, again, we believe that the judge should have ruled on our JNOB, because by his very ruling on count two, he said the jury was wrong and never should have gone to the jury. Counsel, let me ask you. Sure. How is this a jury question? How is this ever a jury question? It's not a jury question. You'll see that at the end of my argument, I was going to say that further, given the court's ruling on count two, they should have awarded summary judgment, but they didn't, so they let it go to the jury, and whether more consideration in reading or I don't know why, but his ruling is in direct opposition to the jury verdict. I don't know what to tell you, but that's the fact, and Your Honor raised it out of the gate that, wait a minute, this is a breach of contract. There's no ambiguity here. He can interpret the contract. He claimed there was no ambiguity. That's why he ruled what he did on count two. So I'm not here to speculate or guess, but it's our opinion that it never should have gone to the jury, that it should have been handled on summary judgment because nobody disputed the facts. My next argument is based on an oral contract that was alleged to have existed between App Properties and the Shillers. The oral contract, they allege, was that they would bring a lawsuit. The lawsuit, if successful, they would pay the money back to App Properties that they advanced them, as I previously said, the 40% differential. However, through all the discovery, I think it's a 2014 case, nine years, we've not seen an email, a conversation setting forth a specific date that this agreement actually happened, nothing. In fact, the testimony is if the Shillers tomorrow told Mr. Stanton, dismiss the case, they would have no obligation to pay App Properties a dime. Another important fact is the Shillers, by their own admission, have paid no legal fees over nine years to bring this matter. I don't understand how that is relevant. Because there's no mutuality of this agreement, Your Honor. If you have a contract, both parties have to have some skin in the game. They have no skin in the game. This wasn't brought by the Shillers because the Shillers were concerned about anything. This was brought on behalf of App Properties to recover money that they advanced the Shillers in order to get them in the boat sooner. That's what this is about, and it's testified. It's in the record. That App Properties, in order to entice the Shillers to leave with all the spending contracts, said, hey, come on over here, and we'll reimburse you for that money. That's all that's in any of the offer letters. That's all that you see in writing. After the fact, I believe, or maybe never, there was some sort of an agreement, which nobody can testify as to what the date that that agreement actually occurred. Now, we're talking about hundreds of thousands of dollars, but nobody really can tell you, did we decide on this on March 10th, on the 24th, in April, in May last year? Nothing. There's no specificity or detail of that contract, and there's no mutuality. The Shillers had no skin in the game. They didn't have to perform under the contract. They had already been given an offer letter where they were told that they would be receiving reimbursement for these funds, but there's nothing in that offer letter that says anything about an effort to pay the money back to them or to maintain the lawsuit or of anything else, any other nature. In fact, they testified they could have walked away at any point, and only morally were they believed to be obligated to do that. We also argue that Motion Eliminating Number 7 should have been ruled upon because earned is not an issue. It's a red herring. The issue of the contract is not earned. The issue is what the split's going to be. Counsel, did that motion eliminate that objection? Did you renew that objection at trial? We believe we did. You'd have to look at the brief, Your Honor. I'm pretty sure that we did. We objected to a lot of things during the course of the trial. Lastly, the editor. The confusion here is the jury came back with a verdict that said we breached the contract. Okay? And then the jury calculates the damage that they claim were owed based upon a provision in the second addendum that had nothing to do with nothing. Nobody testified anywhere during the trial that there was any The Schillers disclosed the 90% commission that they were given in the second addendum, and that is the only time where the commission would be reduced to 75%, which is baffling to me because they claim we breached a contract to pay them 90% in the answers to the jury instructions, but yet they gave them 75%. So we're concerned that there was confusion in the jury room. They did not believe that we owed them 90%, otherwise they would have gave them 90%. It looks to me, unfortunate use of terms, as a split the baby, that they decided to give 75%. We did not consent to the editor for those very reasons because we can't determine how did they come to this and why did they come to this, and yet the editor was granted. Thank you, Your Honors. Thank you. Are there any questions? Mr. Stanton? Should we try five minutes? Yes. Okay. Everyone wants to get out of here. I'll be quick, Your Honors. A couple things. One, I want to follow up. Mr. Perna mentioned that the second addendum, the reference to the policy manual said new policy manual. It doesn't say new policy manual. It says policy manual. So they weren't given notice there was a new policy manual. That's undisputed. With respect to earned, of course earned is relevant here. The whole case comes down to earned. That's why the court denied the motion to dismiss, denied the cross motions for summary judgment, and once the commissions are earned, which it's undisputed they were under zinc and the undisputed testimony, then you have to strictly construe any ambiguity against the drafter. Again, that's home services. And any sort of reduction in the commissions has to be clear. And you also then have the WAIJAC regulation that comes into place that clearly shows that there's a difference between earned and closing. Council wants to make earned and closed the same thing. They're not. Paragraph 6 of the sales associate agreement has two wins. When a commission is earned, when it's payable. It's two separate things, two separate events. Molly Ryan, the general counsel of home services, could have very easily made that clear in the second addendum. She didn't. So any ambiguity has to be construed against home services. With respect to the oral argument, there was lots of testimony. This was a huge part of the case. And both Tim Schiller and the CEO of their new brokerage testified that if home services reduced the Schiller's commissions, the new broker would advance them to offset the harm. And in consideration, the Schillers would immediately come over to the new brokerage. They would pursue the case. And they would repay the new brokerage with any money recovering this case. That was the testimony. Tim Schiller did testify that he had a moral obligation. But those two things aren't mutually exclusive. In fact, Tim Schiller made this clear. And this is in the record, sub to R90 to R91. When asked, why are you here today? Why did you bring this lawsuit? Mr. Schiller answered, well, one, we felt it was wrong that Berkshire Coning Stray did this to us. We also felt we had an obligation to their new broker to get back the money. So clearly, you can have a moral obligation and a legal obligation. And Tim Schiller testified over and over and over again that he had an obligation, a legal obligation under the oral contract. And when asked if the jury awarded some damages, his answer was we'd pay back based on the oral agreement. And the jury clearly found, I think it was two through six of the jury verdict, that the Schillers met offer acceptance consideration for the oral agreement. So we had an oral agreement. With respect to Adderter, the court didn't grant Adderter. The court granted a JNLB motion. And I think we cited this in our briefs, the Chapman v. Deep Rock Oil case, 333-LF-529. Very same case on point. The only evidence here was the $155,016.78. That's the difference between the 90% and the 50%. There was no other evidence of damages. So we don't know why the jury did what it did. I mean, albeit it was a late Friday afternoon, maybe. Who knows? But we can't speculate to that. But as the judge said, there was going to be a new trial on what? There was only one number of damages put into evidence. Counsel didn't even cross Tim Schiller on that number. It was undisputed. So that's the damages. And Judge Schwartz probably granted a motion for JNLB to have the verdict conform with the evidence at trial. That's all I have, unless you have any questions, Your Honors. I have no questions. Thank you. Thank you. So we thank both of you for your arguments this afternoon. We will take the matter under advisement and we'll issue a written decision as quickly as possible.